IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

LAURA B. JOHNSON,               )
       Plaintiff,               )
                               )          Civil Action No. 3:14-cv-00043
v.                              )
                               )          **MEMORANDUM OPINION**
CAROLYN W. COLVIN,              )
Acting Commissioner of Social Security,   )     By:     Joel C. Hoppe
      Defendant.               )          United States Magistrate Judge

Plaintiff Laura B. Johnson asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–34, 1381–1383f. On appeal, Johnson argues that the ALJ erred in weighing her credibility and evaluating the opinions of her treating physicians. The case is before me by the parties' consent under 28 U.S.C. § 636(c)(1). ECF No. 8. Having considered the administrative record, the parties' briefs, and the applicable law, I find that substantial evidence supports the Commissioner's final decision, and it is therefore affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); 20 C.F.R. §§ 404.1520(a), 416.920(a)(4). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden

shifts to the agency to prove that other jobs that the claimant can perform exist in the national economy. *See id.* at 472–73.

## II. Procedural History

Johnson filed a protective application for DIB and SSI on June 29, 2011. *See* Administrative Record ("R.") 115–16. The application alleged disability from back pain and depression. R. 253–56. At the time she applied for benefits, Johnson was fifty years old, R. 253, and worked part-time at home spinning wool for a local sheep farmer, R. 249–52.

Prior to her current claim, Johnson filed three other applications seeking disability benefits, all of which were denied. R. 11. The most recent of these prior applications was denied by ALJ Brian Kilbane in a written decision dated May 27, 2011. R. 67–84. ALJ Kilbane found that Johnson suffered from severe impairments of degenerative disc disease, depression, and anxiety, R. 69, but that these impairments did not meet or medically equal a listed impairment in the regulations, R. 70–71. After determining Johnson's residual functional capacity ("RFC"),[1] R. 71, ALJ Kilbane found that Johnson was not disabled because she could perform her past relevant work as a production worker and as a housekeeper, R. 82–83. In the alternative, ALJ Kilbane found that Johnson could, within her limitations, perform occupations available in significant numbers in the national and regional (Virginia) economy, such as product inspector, hand packer, and maid. *Id.*

---

[1] Residual functional capacity, or "RFC," is an applicant's *maximum* ability to work "on a regular and continuing basis" despite his or her limitations. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the applicant's record, 20 C.F.R. §§ 404.1545(a), 416.945(a), and reflects the "total limiting effects" of the person's impairments and related symptoms, *id.* §§ 404.1545(e), 416.945(e); *see also* SSR 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985) ("Any impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment.").

3

Johnson's current applications provide a disability onset date of May 28, 2011, the day after ALJ Kilbane issued his decision. R. 230, 253–54. The state agency denied her applications at the initial and reconsideration levels, and Johnson requested a hearing before an ALJ. R. 11. On November 5, 2013, she appeared with counsel for a hearing before ALJ Brian Rippel. R. 31–62. Johnson testified as to her impairments and the symptoms and limitations caused by those impairments, R. 40–54, and a vocational expert ("VE") testified as to Johnson's ability to return to her past work and perform other work existing in the economy, R. 55–61.

ALJ Rippel denied Johnson's application in a written decision dated December 5, 2013. R. 11–24. He found that she still suffered from severe degenerative disc disease, affective disorder, and anxiety disorder, R. 14, but that these impairments did not meet or medically equal a listing under the regulations, R. 14–15. ALJ Rippel then determined, based on Johnson's RFC and the VE's testimony, that she could perform her past relevant work as an assembly machine tender or housekeeper. R. 22. He also determined, in the alternative, that Johnson's limitations did not restrict her from being able to perform other light, unskilled jobs existing in the national economy, such as small part assembler. R. 22–23. ALJ Rippel therefore found that Johnson was not disabled after May 28, 2011. R. 23. The Appeals Council denied Johnson's request for review, R. 1–3, and this appeal followed.

### III. Facts

#### A.    ALJ Kilbane's Findings

ALJ Kilbane noted that Johnson first injured her back at work in 2005 and subsequently received an initial diagnosis of spondylitic spondylolisthesis[2] and lumbar degenerative disk

---

[2] Spondylitic spondylolisthesis is the forward displacement of one vertebra over another, characterized by inflammation of the vertebrae. *See Dorland's Illustrated Medical Dictionary* 1779 (31st ed. 2007) ("Dorland's").

4

disease. R. 73. In 2006, Johnson underwent an MRI that showed a grade II spondylolisthesis at L5-S1 with spondylolysis and bilateral neuroforaminal stenosis.[3] *Id.* During this time, she had a good painless range of motion of the hips and knees and a negative straight leg raise test, but she nonetheless complained of pain that radiated into her legs. *Id.* Later testing indicated that she had a limited range of motion and tenderness to palpation in her lumbar region. R. 74. These symptoms remained largely consistent throughout the course of her treatment. *See* R. 73–79. Johnson received epidural steroid injections, R. 73–74, and took narcotics and anti-inflammatory medication for pain management, R. 73, 76-79. She received a TENS unit, R. 75, was prescribed a cane, R. 76, and occasionally attended physical therapy, R. 73-79. She chose not to undergo surgery, however, when her doctor presented it as an option. R. 73-74.

Regarding her physical limitations, Johnson testified to ALJ Kilbane that she had stopped working due to her back pain, which occurred every day when she woke up and when she sat or stood for too long. R. 72. She claimed that she could stand for fifteen minutes in one spot, sit for one hour in a comfortable chair, and walk for no more than a half hour at a time. *Id.* Johnson stated that on some days her back pain prevented her from getting out of bed and that on an average day she would lie down for six to eight hours. *Id.* She further claimed that she could not lift more than ten pounds and that pain limited her ability to bend and caused problems with her balance. R. 73.

ALJ Kilbane found that Johnson's impairments could reasonably be expected to cause some of her alleged symptoms, but that her "statements concerning the intensity, persistence and

---

[3] Neuroforaminal, or spinal, stenosis is a narrowing of openings in the spine that can put pressure on the spinal cord or nerves and can cause pain, tingling, and other symptoms. *See* Mayo Clinic, *Spinal Stenosis: Definition*, http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105 (last visited Sept. 25, 2015).

5

limiting effects of these symptoms are not credible to the extent they are inconsistent" with his finding of Johnson's RFC. R. 80. He found that Johnson magnified her symptoms, and he noted her history of non-compliance. *Id.* This history included her sporadic participation in physical therapy, refusal to pursue surgical options, and missed appointments to receive an epidural steroid injection and a right medial branch block in the L5-S1 area. R. 80–81. ALJ Kilbane further noted that Johnson exhibited behavior that was inconsistent with disabling back pain. For example, in 2009 she told her therapist that she planned to apply to work as a caretaker for a friend, and in 2010 she reported that she had hyper-extended her arm while wrestling with her boyfriend. R. 81. In addition, ALJ Kilbane found that the medical evidence strongly indicated drug-seeking behavior by Johnson. He noted that Johnson's doctor and pain management specialists indicated that narcotics were not a good choice for her treatment. R. 81. Nonetheless, Johnson continued to request prescriptions for Percocet after being told to discontinue using it, became agitated when her doctor refused to write her a prescription, and ultimately was discharged from treatment because of her behavior. *Id.*

ALJ Kilbane gave great weight to the reports of the state Disability Determination Service ("DDS") consultants, which found that Johnson's back condition was not disabling. R. 82. He gave little weight, however, to the opinion of Johnson's treating physician, who had suggested that she could not lift, push, or pull anything over ten pounds, that she was limited to sedentary work,[4] and that she should change her position every thirty to forty minutes. *Id.* ALJ

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). A person who can meet those lifting requirements can perform a full range of sedentary work if he or she can sit for about six hours and stand and walk for about two hours in a normal eight-hour workday. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002); SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

6

Kilbane noted that the treating physician had to rely on Johnson's subjective descriptions of her pain in order to give his opinion and that these expressions of pain were not fully credible. *Id.*

ALJ Kilbane likewise found that Johnson's mental health impairments were not disabling. He noted that she exhibited symptoms of depression, including anhedonia, difficulty falling asleep followed by sleeping for excessively long hours (typically twelve hours at a time), and irritability. R. 79. She was diagnosed with major depressive disorder and generalized anxiety disorder and prescribed medications for her impairments. R. 80. Johnson testified that her depression, as well as her back pain, contributed to her failure to get out of bed for large portions of the day. R. 72. She also testified that she experienced frequent crying spells, thought negatively about herself, had little energy, and relied on her boyfriend to perform basic household chores. R. 73. Nonetheless, ALJ Kilbane determined that Johnson's treatment was "routine and conservative" and noted that she frequently missed appointments and had large gaps in her treatment. R. 81. He also noted that Johnson's doctor reported "significant concerns" regarding her use of Klonopin. R. 80. As with Johnson's back pain, ALJ Kilbane placed great weight on the opinions of the DDS consultants who found that her mental health symptoms were not disabling. R. 82.

Based on these findings, ALJ Kilbane determined that Johnson had the RFC to perform light work,[5] but was limited to "occasional climbing of ramps and stairs, climbing of ladders, ropes, and scaffolds, stooping, kneeling, crouching, and crawling." R. 71. He noted that Johnson had "moderate limitations in her ability to maintain attention and concentration for extended

---

[5] "Light work" involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting requirements can perform light work only if he or she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

Case 3:14-cv-00043-JCH   Document 19   Filed 11/04/15   Page 7 of 34   Pageid#: 607

periods and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." *Id.* He further noted that Johnson was "moderately limited in her ability to interact appropriately with the general public." *Id.* ALJ Kilbane stated that Johnson "would be able to perform simple, unskilled, non-stressful work" in an environment that provided for normal morning, afternoon, and lunch breaks; accommodated her limitations in concentration, persistence, and pace; and limited her contact with the general public. *Id.*

B.   *Current Medical Evidence*

   1.   *Treatment Records*

      a.   *Mental Health*

Johnson re-established mental health treatment with the University of Virginia Health System ("UVAHS") on November 4, 2010, and was examined by resident physician Renu Shah, M.D. R. 477–79. Dr. Shah noted that Johnson's history of psychiatric symptoms dated back to when she was sixteen years old and that her most recent episode of depression was brought on five years earlier by her back injury. R. 478. Johnson reported that she spent most of her time in bed, sleeping up to thirty-six hours at a time, and that she suffered from crying spells, fatigue, irritability, and "a lack of desire to go anywhere or do anything." *Id.* Johnson also reported having panic attacks that occurred twice per month and indicated that she was hesitant to taper off of Klonopin because she felt it was the only thing that could help her with these attacks. *Id.* Dr. Shah reported a Global Assessment of Functioning ("GAF")[6] score of 55[7] for Johnson during this visit. R. 481.

_____

[6] GAF scores represent a "clinician's judgment of the individual's overall level of functioning." Am. Psychological Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000) ("DSM-IV"). The scale is divided into 10 ten-point ranges reflecting different levels of

Johnson continued to receive mental health treatment at UVAHS about once every one or two months through May 2011 from Dr. Shah and attending physician Richard Merkel, M.D., Ph.D. *See generally* R. 458–77. During this time, she was prescribed a combination of medications for her psychiatric conditions, including Klonopin, Zoloft, Trazodone, Lithium, and Cymbalta. *Id.* Drs. Shah and Merkel expressed concern about Johnson's use of Klonopin, noting that she exhibited drug-seeking behavior by demanding early refills and taking more than the amount prescribed, despite being instructed not to do so. R. 462. Dr. Shah's transfer report noted that during this time, Johnson "consistently exhibited negative thinking and would catastrophize." *Id.* She often complained of isolation from her family, R. 460, 470, feelings that people ignore or take advantage of her, R. 464-65, 467, 475, and difficulty getting things done and getting and keeping a job, R. 465, 473, 475. Although her doctors encouraged her to seek out cognitive behavioral therapy and individual psychotherapy, Johnson did not want to pursue these options. R. 462. The findings on Johnson's mental examinations during this time were generally moderate. Although her doctors noted that Johnson's mood was usually depressed and she demonstrated decreased interest, energy, and concentration, they also found that her appearance was well-kempt, her behavior was appropriate or slightly retarded, her speech was fluent, her affect was congruent, her perceptions were normal, and her thoughts were intact. These findings are reflected in Johnson's consistent GAF scores of 51 to 60. R. 461, 465–66, 468, 471, 473–74, 476.

---

functioning, with 1–10 being the lowest and 91–100 the highest. *Id.*

[7] A GAF score of 51–60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.

9

From July 2011 through June 2012, Johnson received treatment from Dr. Merkel, along with resident physician Ivan Putziger, M.D., and attending physician Zachariah C. Dameron, M.D. *See generally* R. 435–58. During this time, Johnson experienced fluctuations in her mood that corresponded with events in her personal life, particularly those involving her financial situation and her relationships with her son and boyfriend. *See* R. 436, 445, 447, 450, 453, 456. At times when Johnson experienced personal struggles with her son, Dr. Putziger noted that her appetite and sleep quality worsened, to the point that Johnson stayed in bed for a week after one distressing event. R. 447–48, 450–51.

During this period, Johnson began taking Remeron to treat her depression, anxiety, insomnia, and poor appetite. R. 451. She nonetheless continued to struggle with her Klonopin use. In May 2012, Dr. Merkel noted that Johnson experienced dysphoria, irritability, forgetfulness, and unusual thoughts after running out of Klonopin for several days before she could refill her prescription. R. 439–40. Despite her occasional difficulties, Johnson's GAF during this period was assessed at 51 to 60, R. 458; or at 61 to 70,[8] R. 437, 440, 443, 446, 449, 452, 454. Likewise, findings from her mental status examinations continued to be mild. Her behavior was generally appropriate, although at times slightly disorganized and restless. Her mood was generally depressed or neutral, her affect was congruent but sometimes labile, and her cognition and thought processes were normal. R. 437, 440, 443, 446, 449, 451–52, 454, 457.

The only exception to these usually mild reports is from July 13, 2012, when Dr. Merkel reported that Johnson had been "in crisis" since her last visit. R. 432. During this interim, she was "on and off" with her boyfriend and particularly struggled when he was not around. *Id*. Dr.

---

[8] A GAF score of 61–70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV*, *supra* note 6, at 34.

Putziger had recommended that she go to the emergency room at one point when she was particularly anxious, but she was sent home because of a lack of psychiatric beds. *Id.* She also had continuing struggles with her son and her car. *Id.* As a result of her distress, Johnson functioned poorly, suffered from crying spells along with increased depression and anxiety, and overused her Klonopin. *Id.* She also reported that she had fallen and broken her coccyx, causing pain and limited mobility. *Id.* Her GAF was reported at 41 to 50.[9] R. 434.

From August 2012 through May 2013, Johnson was treated by Dr. Merkel, Dr. Dameron, and resident physician Ivona Bendkowska, M.D. R. 398–432. She reported similar stressors, R. 399, 401, 403, 407, 410, 413, 420, 423–24, and her condition remained mostly consistent during this time. Johnson made occasional attempts to set up appointments for therapy, R. 413, 430, but does not appear to have gone through with any sessions. She was prescribed Risperdal and later Haldol, but was ambivalent about these medications and did not take them for any significant amount of time. R. 401–02, 413, 417, 421, 425, 427. Meanwhile, she continued to overuse Klonopin. R. 401–04. Throughout this period, her GAF was reported at 61 to 70, and her mental status examination findings were typically mild. R. 400, 404–05, 407–08, 411, 414, 417–18, 421, 424–25, 427–28, 431.

In July and August 2013, Johnson received treatment from Dr. Merkel and resident physician Damon Deleon, M.D. *See generally* R. 485–91. During these visits, her GAF was reported at 61 to 70, and her mental status examination findings were good apart from a slightly depressed mood. R. 487, 490. No further psychiatric visits are evidenced in the record.

---

[9] A GAF score of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV*, *supra* note 6, at 34.

b.    *Back Pain*

After December 2010, which is the most recent treatment date mentioned in ALJ

Kilbane's report, R. 79, the first medical record addressing Johnson's back pain is the report of

Kathleen McManus, M.D., dated April 27, 2011. R. 307–11. Dr. McManus noted that Johnson

reportedly had injured herself in bed two weeks prior to this visit and had pain at her sacroiliac

("SI") joint. R. 308. Dr. McManus also stated that Johnson had chronic and persistent back pain,

for which she had been treated with injections, but stopped because she did not have a car. *Id.*

Johnson stated that the pain typically rated at 6 out of 10, lasted all day, and radiated down her

legs at night. *Id.* She treated it with extra strength Tylenol. *Id.* Johnson claimed that she had

earlier success with physical therapy. *Id.* The musculoskeletal portion of Johnson's physical

exam indicated tenderness in her lumbar back. R. 310.

On June 18, 2011, Johnson presented to the UVAHS emergency department with

complaints of chest pain. R. 297–301. She also reported experiencing some pain in her mid-back.

*Id.* The musculoskeletal portion of Johnson's physical exam indicated a normal range of motion.

R. 299. In February 2012, she received a letter of medical necessity for a thoracolumbosacral

orthosis ("TLSO") brace. R. 370. On March 8, 2012, she had an initial visit and evaluation for

the TLSO brace with Ed Hicks of the University of Virginia Prosthetic and Orthotic Department,

R. 385, and on April 2, 2012, Hicks gave Johnson the brace with instructions to begin using it for

one half to one hour, twice per day, and to increase her use by a half hour each day, R. 371, 384.

On March 26, 2012, she was treated by Francis Shen, M.D., at UVAHS. R. 382–83. Dr.

Shen noted that Johnson's pain was distributed between her back and legs, with 90% of the pain

in her back and 10% in the legs. R. 382. The pain was reported to be worse while standing and

walking and was greater in the right leg than in the left. *Id.* Dr. Shen noted that Johnson had not

12

received any formal therapy or medication, but had received a medial branch block and lumbar epidural injection. *Id.* Johnson also claimed to have fallen in January 2012 while at home. *Id.* She could toe and heel walk without difficulty, and she ambulated without aids. *Id.* She was tender to palpation at the bilateral lumbosacral junction, had a positive FABER test for right SI joint pain, and had normal lower extremity strength. *Id.* Dr. Shen reviewed X-rays that showed spondylolisthesis at L5-S1 with grade 2 slip and lumbar degenerative disc disease. *Id.* He noted that Johnson's situation was "challenging" in that her pain was focused more at the SI joint than the lumbar region and that any options for surgery would only be for leg pain and nerve compression, not for back pain. *Id.*

At a follow-up appointment on April 4, 2012, Dr. Shen confirmed the diagnosis of lumbar degenerative disc disease, Spondylitic spondyloschisis[10] grade II L5-S1, and Sacroiliitis.[11] R. 381. He again noted that Johnson could ambulate without aids and had good strength in her upper and lower extremities. *Id.* He also noted that Johnson's symptoms were "persistent and worsening" despite conservative treatment and epidurals, and he ordered an MRI of her thoracic spine. *Id.* The MRI was conducted on May 11, 2012, and it indicated convex leftward curvature of the upper thoracic spine and generalized disc bulges at C6-C7 and C7-T1 indenting the thecal sac without significant stenosis or neuroforaminal narrowing. R. 386.

On April 9, 2012, Johnson presented to Dr. McManus for a hand injury, back pain, and constipation. R. 372–76. Dr. McManus noted that the worst of Johnson's back pain was in her thoracic spine, with occasional pain in the lumbar spine. R. 372, 375. Johnson had not been

---

[10] Spondyloschisis, or rachischisis, is a congenital fissure of the vertebral column. *See Dorland's, supra* note 2, at 1593, 1780. This diagnosis is not consistent with the rest of the medical record, and may be a misspelling of "spondylolisthesis." *See supra* note 2.

[11] Sacroiliitis is inflammation or arthritis of the SI joint. *See* Dorland's, *supra* note 2, at 1687.

wearing her TLSO brace much after having received it one week earlier, and she explained that she did not have appropriate clothing that would fit comfortably under the brace. *Id.* Dr. McManus reported that Johnson was taking flexeril and gabapentin for the pain and that she would not increase Johnson's dosage of flexeril. R. 376. Johnson also claimed that her mood was bad because of her back pain. R. 372.

The most recent evidence in the record of treatment for Johnson's back pain is a durable medical equipment prescription and letter of medical necessity for a DME P&O LS Corset, dated October 16, 2012. R. 392. The letter of medical necessity notes that the device was expected to have a therapeutic effect on Johnson's activities of daily living and that Johnson's prognosis was fair. *Id.*

### 2.     *Medical Opinions*

#### a.     *Dr. Merkel's Opinions*

On October 30, 2012, Dr. Merkel, Johnson's treating physician for mental health, completed a Mental Residual Functional Capacity Questionnaire. R. 387–91. Dr. Merkel listed Johnson's clinical disorders, by DSM numerical listing, as Major Depressive Disorder, Recurrent, Moderate (296.32); Panic Disorder with Agoraphobia (300.21); and possible Dysthmic Disorder (300.4).[12] R. 387. He stated that Johnson was partially responding to treatment and listed her prescribed medications as Clonazepam, Lithium, Remeron, and

---

[12] Dr. Merkel listed Johnson's diagnoses by DSM number, rather than by name. R. 387. Other diagnoses were also listed, but it is difficult to discern what these are. Dr. Merkel includes in his diagnosis DSM number 300.2, R. 387, which is not a listed diagnosis, *see DSM-IV*, *supra* note 6, at 857–66. ALJ Rippel understood this to be Generalized Anxiety Disorder (300.02). R. 18. Dr. Merkel also listed DSM number 314.00, R. 387, which corresponds to Attention-Deficit/Hyperactivity Disorder, Predominantly Inattentive Type, *DSM-IV*, *supra* note 6, at 85–93. In his written decision, ALJ Rippel listed this as a diagnosis of Dissociative Identity Disorder, R. 18, which is actually listed in the DSM as 300.14. The treatment notes do not list either diagnosis.

Trazodone. *Id.* He described his clinical findings as "depressed mood with affective lability, . . . poor memory, poor attention and concentration, anxiety and panic, poor self-esteem, and dependency" and stated that his prognosis was guarded.[13] *Id.* Dr. Merkel identified Johnson's symptoms as decreased energy; feelings of guilt or worthlessness; generalized personal anxiety; mood disturbance; difficulty thinking and concentrating; psychomotor agitation or retardation; pathological dependence, passivity, or aggressivity; persistent disturbances of mood or affect; intense and unstable interpersonal relationships and impulsive and damaging behavior; emotional lability; easy distractibility; memory impairment; and recurrent severe panic attacks occurring on the average at least once a week. R. 388.

Dr. Merkel also assessed Johnson's abilities and aptitudes needed to do work. R. 389–90. He found that she was seriously limited, but not precluded, in the following areas: remember work-like procedures; make simple work-related decisions; perform at a consistent pace without an unreasonable number or length of rest periods; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; understand and remember detailed instructions; carry out detailed instructions; adhere to basic standards of neatness and cleanliness; travel in unfamiliar place; and use public transportation. *Id.* He found that she was unable to meet competitive standards in the following areas: maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically-based symptoms; deal with normal work stress; set realistic goals or make plans independently of others; deal with stress of semiskilled and skilled

---

[13] Another clinical finding ("cognitive …") listed in this section is mostly illegible. R. 387.

work; interact appropriately with the general public; and maintain socially appropriate behavior. *Id.*

Dr. Merkel specifically noted that "[Johnson's] mood and anxiety difficulties prevent or inhibit her ability to be organized, attend punctually, and work in coordination with others," R. 389; "she is disorganized and has a great deal of difficulty managing daily activities" because of her poor memory and concentration, R. 390; and her "labile affect and distractibility make interpersonal interactions difficult," *id.* He stated that it was "quite possibl[e]" that Johnson's psychiatric conditions exacerbated her physical symptoms, *id.*, and her impairments would cause her to be absent from work more than four days per month, R. 391.

On September 25, 2013, Dr. Merkel completed a Medical Assessment of Ability to Do Work-Related Activities (Mental). R. 483–84. He stated that Johnson had a fair ability to follow work rules, relate to co-workers, deal with the public, use judgment with the public, interact with supervisors, function independently, carry out simple job instructions, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. *Id.* Dr. Merkel, however, assessed that she had poor or no ability to deal with work stresses, maintain attention and concentration, and carry out complex job instructions. *Id.* He specifically noted that Johnson's depression and anxiety "impact[] on her cognitive abilities, memory, attention, and concentration," she has "periods of psychosis," and she is disorganized and easily overwhelmed. *Id.*

> b. *Dr. McManus's Opinion*

On November 28, 2012, Dr. McManus completed a Physical Residual Functional Capacity Questionnaire. R. 393–97. She listed Johnson's diagnoses as lumbar degenerative disc

disease and spondylitic spondyloschisis[14] grade II L5-S1, and noted that there had been no

change in her prognosis for 27 months, but that they continued to work on pain management. R.

393. X-rays depicted grade II anterolisthesis[15] of L5 on S1 and bilateral pars defect of L5. *Id.* Dr.

McManus noted that Johnson's pain was consistent, precipitated by standing, and rated at 6 out

of 10 on average, but could reach as high as 8 out of 10. *Id.* She further noted that Johnson's

depression and anxiety could contribute to the severity of her physical symptoms and that these

symptoms were severe enough to frequently interfere with Johnson's attention and concentration.

R. 394. Dr. McManus then listed the following limitations, noting that these were "per patient

report": walk one city block without pain; sit for 30 minutes at a time before needing to get up;

stand for fifteen minutes at a time before needing to sit or walk around; sit for less than two

hours and stand or walk for less than two hours in an eight-hour day with normal breaks; must

walk around every fifteen minutes for at least four minutes; need to take two to four minute

unscheduled breaks four times per hour; frequently lift 10 pounds or less; never lift 20 pounds or

more; and reach overhead 50% of the workday. R. 394–96. Dr. McManus also stated that

Johnson could rarely twist, stoop, crouch, or squat and could never climb ladders or stairs.[16] R.

396. She opined that Johnson would be absent from work three days a month. *Id.*

> c.  *Other Opinion Evidence*

On October 8, 2013, Virginia Workman completed a Medical Assessment of Ability to

Do Work-Related Activities (Physical). R. 500–01. The findings were more restrictive than in

any other opinion. Virginia Workman signed on the physician's signature line, but is not

---

[14] *See supra* note 10.

[15] Anterolisthesis is another name for spondylolisthesis. *Dorland's*, *supra* note 2, at 99; *see supra* note 2.

[16] Unlike with the other limitations, these were not specified as being per Johnson's report. R. 396.

otherwise identified as a medical doctor. R. 501. The record contains no treatment notes from Virginia Workman.

DDS examiner Howard Leizer, Ph.D., reviewed Johnson's record on October 11, 2011, and made findings regarding her mental health condition. R. 98–99. Dr. Leizer opined that Johnson "should have no more than moderate difficulty with concentration, task persistence, work relationships, and adapting to novel tasks." R. 98. He found Johnson to have moderate limitations in the following areas: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. R. 98–99. He found that she was not otherwise significantly limited. *Id.* He concluded that Johnson's limitations "do not prevent [her] from engaging in competitive, nonstressful tasks at SGA levels." R. 99. A second DDS examiner, Julie Jennings, Ph.D., reviewed Johnson's record on March 28, 2012, and concurred with Dr. Leizer's assessment. R. 124–26.

DDS examiner Shirish Shahane, M.D., reviewed Johnson's record on October 6, 2011, and made findings regarding her physical condition. R. 96–97. Dr. Shahane opined that Johnson could occasionally lift 20 pounds and frequently lift 10 pounds; stand or walk for six hours and sit for six hours in an eight-hour workday; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. *Id.* Dr. Shahane also determined

that Johnson had no limitations in pushing or pulling, other than the limitations he described for lifting, and that she needed to avoid concentrated exposure to hazards. *Id.* Another DDS examiner, Joseph Duckwall, M.D., reviewed Johnson's record on March 27, 2012, and concurred with Dr. Shahane's assessment. R. 122–24.

C.     *Hearing Before ALJ Rippel*

1.     *Johnson's Testimony*

During an administrative hearing on November 5, 2013, Johnson testified as to her mental and physical conditions. R. 35–54. She described bilateral lower back pain that was achy, throbbing, and sometimes shooting. R. 40–41. She claimed that she could get relief from the pain by resting in bed and through medication, but that the pain was exacerbated by standing for more than ten minutes, walking, bending, or squatting. R. 41–42. Johnson testified that she could sit for about thirty minutes at a time in a comfortable chair and that she could walk for about an eighth of a mile, but would need to take a break during the course of the walk. R. 42–44. She stated that her pain caused her to lose concentration and limited her ability to go out and socialize. R. 47–48.

Johnson testified that the pain, combined with her financial situation, were the main causes of her depression and anxiety. R. 48–49. She also claimed that the combined effect of her medical conditions prevented her from doing activities that she previously enjoyed, such as taking walks outside, doing heavy work, and bowling. R. 50–51. Johnson stated that she would leave the house only to go to doctor's appointments and she got rides from a friend or a volunteer coalition. R. 39. Otherwise, she claimed to stay in bed for, on average, eleven hours out of a twelve-hour day. R. 44. She stated that she worked between four and twelve hours per week spinning wool and making hats. R. 36–37. She primarily worked on the hats while in bed, but got

out of bed to spin the wool. R. 44–45. She also stated that she got out of bed to make a meal, take a shower, or wash dishes, R. 44, but that her pain prevented her from cleaning around the house, R. 52.

2.    *ALJ Rippel's Decision*

ALJ Rippel determined that Johnson was not disabled. R. 11–24. He determined that Johnson had the RFC to perform light work, but could "only occasionally climb ramps/stairs, balance, stoop, kneel, crouch, crawl or climb ladders/ropes/scaffolds." R. 15. He further stated that Johnson could "perform simple, routine and repetitive entry level, unskilled work in a low stress environment with occasional interaction with the public." *Id.* ALJ Rippel noted that, in making this finding, he "concurs with and adopts [ALJ Kilbane's] finding as to the claimant's exertional capacity," but because of Johnson's worsening back condition he allowed for additional limitations in balancing, climbing of ladders, ropes, and scaffolds, and exposure to hazards. R. 22. He also found greater limitations in Johnson's social interactions because of her recent additional diagnosis of agoraphobia with panic disorder. *Id.* In reaching this RFC, the ALJ questioned the credibility of Johnson's complaints and discredited the opinions of her treating physicians.

Based on this RFC and the VE testimony, ALJ Rippel found that Johnson could perform her past relevant work as an assembly machine tender and housekeeper, as both of these were light, unskilled occupations. *Id.* In the alternative, ALJ Rippel found that Johnson could perform other jobs that exist in significant numbers in the national economy, such as small part assembler. R. 22–23.

20

## IV. Discussion

Johnson argues that ALJ Rippel's decision is not supported by substantial evidence because he improperly found that Johnson's testimony regarding her symptoms was not entirely credible, *see generally* Pl. Amended Br. 16–21, ECF No. 15 (hereinafter "Pl. Br."); and he did not properly consider the opinions of her treating physicians, Dr. McManus and Dr. Merkel, *see generally id.* at 10–16. Ultimately, these arguments attack the validity of ALJ Rippel's RFC finding.

Before considering Johnson's arguments, it is necessary to examine how ALJ Kilbane's prior decision affects ALJ Rippel's determination. The Social Security Administration ("SSA") "treats a claimant's second or successive application for disability benefits as a claim apart from those earlier filed, at least to the extent that the most recent application alleges a previously unadjudicated period of disability." *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 476 (4th Cir. 1999). Findings made by the SSA as to a claimant's initial application for benefits, therefore, do not have preclusive effect as to that claimant's subsequent applications. *See id.* at 476–78. Instead, "SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances" in the record on the claimant's subsequent applications. SSAR 00-1(4), 2000 WL 43774, at *4 (Jan. 12, 2000) (interpreting *Albright*); *see also Dailey v. Colvin*, No. 4:14cv5, 2015 WL 877376, at *7–8 (W.D. Va. Mar. 2, 2015). In determining what weight to give to a prior finding, the adjudicator must consider (1) whether a fact on which the prior finding was based is subject to change over time; (2) the likelihood that such a change took place, taking into account "the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim;" and (3) the extent to which evidence not considered in the prior claim "provides a basis for making a different finding

21

with respect to the period being adjudicated in the subsequent claim." SSAR 00-1(4) at *4; *see also Dailey*, 2015 WL 877376, at *7.

ALJ Rippel gave great weight to ALJ Kilbane's decision, concurring with and adopting ALJ Kilbane's RFC findings while affording Johnson some additional limitations because of the progression of her back condition and her new diagnosis of agoraphobia with panic disorder. R. 21–22. Johnson has not challenged ALJ Rippel's reliance on ALJ Kilbane's RFC as probative evidence of her functioning on the date of her onset. Thus, this case turns in large part on whether Johnson's back and mental health conditions have progressed more seriously from the date of ALJ Kilbane's decision than was acknowledged by ALJ Rippel.

A.    *Johnson's Credibility*

ALJs follow a two-step process for evaluating an applicant's statements about her symptoms. *Fisher v. Barnhart*, 181 F. App'x 359, 363 (4th Cir. 2006) (per curiam) (citing 20 C.F.R. §§ 404.1529, 416.929). The ALJ must first determine whether objective medical evidence[17] shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the symptoms alleged. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *see also Craig*, 76 F.3d at 594–95. If the claimant clears this threshold, the ALJ then must evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they affect her ability to work. SSR 96-7p at *2; *see also Craig*, 76 F.3d at 595.

---

[17] Objective medical evidence is defined by regulation as "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. §§ 404.1528(b)–(c), 404.1529(a); 20 C.F.R. §§ 416.928(b)–(c), 416.929(a). "Symptoms" are the claimant's description of his or her physical or mental impairment. 20 C.F.R. §§ 404.1528(a), 416.928(a).

22

The latter analysis often requires the ALJ to determine "the degree to which [the claimant's] statements can be believed and accepted as true." SSR 96-7p at *2, *4 (instructing ALJs to make a credibility finding "whenever the individual's statements about the intensity, persistence, and limiting effects of [her] symptoms are not substantiated by the objective medical evidence"). The ALJ may not reject the claimant's description of her symptoms "solely because the available objective medical evidence does not substantiate" that subjective description. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *see also Hines*, 453 F.3d at 563–64. Rather, he must consider "all the available evidence" in the record, including the claimant's statements, her treatment history, and the objective medical evidence. 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ must give specific reasons "grounded in the evidence" for the weight assigned to a claimant's statements. SSR 96-7p at *4. A reviewing court will defer to the ALJ's credibility determination except in "exceptional circumstances." *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)). "Exceptional circumstances include cases where a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Edelco*, 132 F.3d at 1011.

ALJ Rippel noted that although Johnson's impairments could reasonably be expected to cause her alleged symptoms, her statements regarding the intensity, persistence and limiting effects of her symptoms were not credible. R. 19. First, as to Johnson's description of her physical symptoms, ALJ Rippel noted that Johnson's descriptions of the extent of her back pain were inconsistent with her treatment records. R. 19–20. ALJ Rippel reported that the first evidence of any treatment after the alleged onset date of May 28, 2011, was Johnson's visit to Dr. Shen on March 21, 2012, "at which time she indicated that she had received an epidural

23

steroid injection in January 2012, following a fall in her home at that time." R. 19–20. He noted

that Johnson's physical examination on that date "was essentially normal, showing no

impairment in her gait or ability to both heel and toe walk." R. 20. He acknowledged that X-rays

indicated that Johnson had degenerative disc disease, but also noted that Johnson reported to Dr.

McManus in April 2012 that she was not wearing her prescribed back brace very often. *Id.*

Johnson is correct to point out that parts of ALJ Rippel's analysis here are erroneous.

ALJ Rippel observed that Johnson's treatment since her alleged onset date of May 28, 2011, was

limited and conservative and stated that the first record of any back pain treatment was from

March 21, 2012. *Id.* This observation, however, is both factually incorrect— a letter of medical

necessity for Johnson's TLSO brace dates from February 2012, R. 370— and is too narrow in its

scope. ALJ Rippel needed to consider "all of the available evidence" in the record, 20 C.F.R. §§

404.1529(c), 416.929(c), including Johnson's "complete medical history for at least the 12

months preceding" the date that she filed her application, 20 C.F.R. §§ 404.1512(d), 416.912(d).

Johnson had reported to Dr. McManus on April 27, 2011—only one month before her alleged

onset date— with complaints that included chronic lower back pain. R. 307–11. It seems highly

unlikely that Johnson's chronic condition would have changed much between that date and her

alleged onset date, and therefore ALJ Rippel should have considered this record. The content of

the April 2011 treatment note, however, blunts the force of the ALJ's omission. The note

presents few objective signs relevant to Johnson's back pain. In the March 2012 treatment note

that the ALJ discussed, Johnson provided a similar narrative of her chronic back pain. *Compare*

R. 382, *with* R. 308. Thus, I cannot find that the ALJ's omission created any significant gap in

his review of the record.

Moreover, the ALJ's error does not detract from the validity of his overall observation of a large gap from 2011 into 2012 during which Johnson received no additional treatment for her back pain. In addition, no evidence in the record indicates that Johnson received treatment for her back problems from April 2012 to December 2013, the date of the ALJ's decision. A claimant's failure to seek treatment can weigh against her credibility regarding the severity of her symptoms if no good reason exists for her lack of treatment. *Mabe v. Colvin*, No. 4:12cv52, 2013 WL 6055239, at *7 (W.D. Va. Nov. 15, 2013). These extensive gaps in Johnson's treatment record, combined with the lack of a good reason for her failure to seek treatment, provide an adequate basis for the ALJ to find that her back pain is not as severe as she claims.

ALJ Rippel also observed that Johnson reported not wearing her TLSO brace much when she visited Dr. McManus on April 9, 2012. R. 20, 372. This observation, however, leaves out some mitigating details. Johnson received her back brace on April 2, 2012, R. 371, only one week before this visit with Dr. McManus. Johnson also did not state that she was completely failing to use the brace, but only that she was not using it frequently because she did not have clothes that could comfortably fit underneath the brace. R. 372. Therefore, ALJ Rippel's observation about Johnson's use of her TLSO brace provides an inadequate reason to question her credibility.

Overall, however, ALJ Rippel's determination that Johnson was not entirely credible with regard to the extent of her back pain is supported by substantial evidence. ALJ Rippel recognized that X-rays showed Johnson had degenerative disc disease and found that Johnson's treatment for her back pain has been conservative, primarily through use of a back brace, epidural steroid injections, and some pain medication. R. 19–20, 370–76, 381–85. "While there is 'no bright-line rule [for] what constitutes conservative versus radical treatment,'" ALJ Rippel

25

could reasonably deem this course of treatment to be conservative and inconsistent with complaints of disabling pain. *Bolden v. Colvin*, No. 4:13cv32, slip op. at 17 (W.D. Va. Jul. 23, 2014) (quoting *Gill v. Astrue*, No. 3:11cv85, 2012 WL 3600308, at *6 (E.D. Va. Aug. 21, 2012)), *adopted by* 2014 WL 4052856 (Aug. 14, 2014). ALJ Rippel also noted that Johnson was able to ambulate without aid and showed no impairment in her gait or ability to heel and toe walk. R. 20. All clinical findings relating to Johnson's back pain have been mild,[18] and the record does not contain significant findings of abnormalities associated with a disabling back problem, such as decreased strength in the extremities, limited range of motion, or reduced reflexes.

ALJ Rippel's finding that Johnson was not entirely credible with regard to her mental health symptoms was based on a number of factors. Spikes in Johnson's symptoms of depression often coincided with significant problems she experienced in her relationships with her son or boyfriend, such as one incident in which her son burned her belongings, R. 447. The ALJ could reasonably find that these events, rather than deterioration in her underlying mental health condition, contributed to the exacerbation in her symptoms. *See id.* In addition, as ALJ Rippel noted, the increase in symptoms from personal problems is at odds with Johnson's testimony that her depression and anxiety were primarily caused by her back pain. R. 20. ALJ Rippel also observed that Johnson exhibited drug-seeking behavior, while at the same time failing to pursue recommended treatment through individual psychotherapy. R. 20. An ALJ may find that a

---

[18] Johnson points to the MRI of her thoracic spine, R. 386, as the most significant objective clinical evidence of a condition that could reasonably give rise to her symptoms. Pl. Br. 20. The MRI depicts spinal curvature and generalized disc bulges without significant stenosis or neuroforaminal narrowing at C6-C7 and C7-T1. R. 386. This evidence is unrelated to Johnson's claims of disabling pain in her *lower* back, *see, e.g.*, R. 40–41, and in any event she has not sought regular treatment for pain in her upper back. The MRI results do not command a different result on a substantial evidence review.

claimant's statements "may be less credible . . . if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7p at *7. Although the record indicates that Johnson made some attempts to initiate psychotherapy, R. 413, 430, she did not follow through on any of these attempts, whereas she consistently sought psychiatric treatment and medication, which she occasionally abused. These factors could reasonably lead ALJ Rippel to determine that Johnson exaggerated the extent of her mental health symptoms.

Also of note were Johnson's inconsistent statements regarding the amount of time she spends in bed. Courts have long allowed parties to use a witness's prior inconsistent statements to impeach his or her testimony. *See Vest v. Colvin*, No. 5:13cv67, slip op. at 52 (W.D. Va. July 17, 2014) (collecting cases), *adopted by* 2014 WL 4656207, at *2–3 (W.D. Va. Sept. 16, 2014); *cf. United States v. Hale*, 422 U.S. 171, 176 (1975) ("A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness."). ALJ Rippel noted that Johnson claimed to stay in bed for eleven hours out of a twelve-hour day, despite her other statements and other evidence indicating that she engages in routine daily activities and regular visits to UVAHS for mental health treatment. R. 20.

Johnson attempts to clarify this statement by arguing that the amount of time she gets out of bed varies from day to day, and that her claim that she is in bed for eleven hours out of a twelve-hour day does not "equate[] to . . . being out of bed one hour out of a full [twenty-four hour] day." Pl. Br. 17. This clarification is not persuasive. The context for a "twelve-hour day" is made clear by Johnson's other statements in the record indicating that she sleeps for about twelve hours per night. R. 79. It was therefore not unreasonable for ALJ Rippel to conclude that

Johnson exaggerated her symptoms and limitations and that her statements conflict with her other testimony regarding her daily activities and "demean her overall credibility." R. 20.

Lastly, ALJ Rippel characterized Johnson's depression and anxiety symptoms described in the treatment record as "mild to moderate." R. 20. This finding is amply supported by many of the mental status exams conducted by Johnson's treating medical providers and her GAF scores "[t]hroughout most of her treatment" of 61 to 70. *Id.* These findings are inconsistent with Johnson's report of symptoms. ALJ Rippel "provided a comprehensive list of reasons," with supporting references to the record, for discrediting Johnson's claim that her symptoms precluded her from working. *Cooke v. Colvin*, No. 4:13cv18, 2014 WL 4567473, at *4 (W.D. Va. Sept. 12, 2014) (finding no legal error where the ALJ "provided a comprehensive list of reasons—and supporting references to the Record—for why he discredited the Plaintiff's testimony"). Accordingly, I find that ALJ Rippel's credibility determination is supported by substantial evidence.

B.    *Treating Physician Opinions*

Johnson also argues that the ALJ erred in discrediting the opinions of her treating physicians. Agency regulations instruct ALJs to weigh each medical opinion[19] in the applicant's record. 20 C.F.R. §§ 404.1527(b), 416.927(b). The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical consultants. *See id.* §§ 404.1527(c), 416.927(c). A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically

---

[19] "Medical opinions are statements from . . . acceptable medical sources that reflect judgments about the nature and severity of [the applicant's] impairment(s)," including: (1) the applicant's symptoms, diagnosis, and prognosis; (2) what the applicant can still do despite his or her impairment(s); and (3) the applicant's physical or mental restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

28

acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ may reject a treating physician's opinion in whole or in part if there is "persuasive contrary evidence" in the record. *Hines*, 453 F.3d at 563 n.2; *Mastro*, 270 F.3d at 178; *Tucker*, 897 F. Supp. 2d at 465.

The ALJ must "give good reasons" for discounting a treating physician's medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). He also must consider certain factors in determining what weight to give that opinion, such as the length and nature of the doctor-patient relationship, the weight of the evidence supporting the opinion, the physician's medical specialty, and the opinion's consistency with other evidence in the record. *See id.*; *Clausen v. Astrue*, No. 5:13cv23, 2014 WL 901208, at *9 (W.D. Va. Mar. 7, 2014). That obligation is satisfied when the ALJ's decision indicates that he considered the required factors. *Burch v. Apfel*, 9 F. App'x 255, 259 (4th Cir. 2001) (per curiam); *see also Vaughn v. Astrue*, No. 4:11cv29, 2012 WL 1267996, at *5 (W.D. Va. Apr. 13, 2012), *adopted by* 2012 WL 1569564 (May 3, 2012). The ALJ must consider the same factors when weighing medical opinions from non-treating sources. 20 C.F.R. §§ 404.1527(c), 404.1527(e)(2), 416.927(c), 416.927(e)(2).

In reviewing the medical opinion evidence, ALJ Rippel considered statements from Dr. McManus, Dr. Merkel, and Virginia Workman.[20] The ALJ noted that Dr. McManus reported that Johnson suffered from fatigue and blurred vision as side effects of her medication. He found that this observation was contradicted by the record of Johnson's March 2013 visit to Dr. Merkel in which Johnson indicated that her medication was not causing side effects. R. 20–21. He further observed that Dr. McManus reported "significant physical limitations of function," but that "her

---

[20] ALJ Rippel gave no weight to Virginia Workman's report because there was no evidence in the record that Workman was a physician or had ever treated Johnson. R. 21.

29

report also clearly notes that she is reporting what the claimant reports to her." R. 21. He therefore chose to give no weight to Dr. McManus's opinion. *Id.*

As discussed *supra*, ALJ Rippel had substantial evidence to conclude that Johnson's descriptions of her subjective symptoms were not entirely credible and were inconsistent with other evidence in the record. Thus, he had an adequate basis to give no weight to Dr. McManus's opinion to the extent it was based solely on Johnson's own report. *See Craig*, 76 F.3d at 589–90 (noting that a medical opinion should be afforded little weight if it is based solely on the claimant's subjective report of symptoms). Johnson correctly notes that not all of the answers included in the questionnaire were expressly labeled as being based on Johnson's report. Pl. Br. 11–12. Even so, the ALJ could properly discredit Dr. McManus's other findings that Johnson's pain and other symptoms, which by definition are subjective, would cause frequent interruptions in concentration, persistence, and pace.

Dr. McManus also opined that Johnson would be absent from work about three days per month because of her impairments or treatment. The frequency of Johnson's treatment visits does not substantiate this claim. Furthermore, it is impossible to separate this finding, which factors in the doctor's overall impression of Johnson's impairments, from her reliance on Johnson's subjective report of symptoms and functional ability. ALJ Rippel's stated rationale for giving no weight to Dr. McManus's opinion, in conjunction with the entirety of his review and analysis of the record, *see McCartney v. Apfel*, 28 F. App'x 277, 279 (4th Cir. 2002) (per curiam), provided "specific and legitimate" reasons to reject a treating-source medical opinion, and those reasons are supported by substantial evidence in the record, *see Bishop*, 583 F. App'x at 67. I therefore find no error in his decision to assign no weight to Dr. McManus's opinion.

As to Dr. Merkel, ALJ Rippel comparatively weighed Dr. Merkel's October 2012 mental RFC questionnaire, R. 387–91, with his September 2013 assessment of Johnson's ability to do work-related activities, R. 483–84, and determined that

> [m]ore weight is given to his first report as it is more consistent with his contemporaneous treating notes consistently reflecting minimal findings on mental status examination and a GAF score of 61 to 70, most recently reported on August 23, 2013, one month prior to his opinion in September 2013, that she was seriously limited.

R. 21. Johnson claims that this determination was in error because ALJ Rippel did not specify how much weight he gave to each opinion and because he failed to identify evidence in the record that contradicted either report. Pl. Br. 14–16.

"The ALJ's decision 'must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave' to the opinion and 'the reasons for that weight.'" *Young v. Colvin*, No. 7:12cv468, 2014 WL 991712, at *3 (W.D. Va. Mar. 13, 2014) (quoting SSR 96-2p, at *5). Johnson is correct that ALJ Rippel could have stated with more clarity the amount of weight he gave to each of Dr. Merkel's opinions as well as which specific findings in each opinion he accepted and which he rejected. There is some inconsistency between the way ALJ Rippel describes these opinions and what the opinions themselves say. For example, although ALJ Rippel gives greater weight to Dr. Merkel's October 2012 report because it is more consistent with Dr. Merkel's contemporaneous findings of mild symptoms and a GAF score of 61 to 70, R. 21, that report itself states that Johnson's GAF score was in the range of 41 to 50 and that her highest GAF score in the preceding year was 55.[21] R. 387. It is also unclear why the ALJ found that Dr. Merkel's September 2013 opinion was less consistent with Johnson's treatment

---

[21] This finding itself is, in turn, inconsistent with Dr. Merkel's own treatment notes. Almost all of the reports signed by Dr. Merkel between October 2011 and October 2012 assess a GAF score for Johnson of 61 to 70. R. 421, 425, 428, 431, 437, 440, 443, 446, 449, 452, 454.

31

records than the October 2012 opinion, as both of these opinions suggest similar overall limitations (poor concentration, ability to handle stress, and ability to properly deal with social situations). R. 388–90, 483–84.

The most troubling deficiency in ALJ Rippel's assessment of Dr. Merkel's opinions is that he does not at all address Dr. Merkel's findings of poor attention, concentration, and persistence. R. 388–89, 483. In fact, ALJ Rippel does not even account in his RFC finding for Johnson's limitations in maintaining concentration, persistence, and pace, despite noting that she had moderate limitations during his step three analysis. R. 15. The Fourth Circuit has stated that failure to account for this particular factor may be reversible error. *See Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015) ("[T]he ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace."). This error, however, was harmless.

In Johnson's prior case, ALJ Kilbane accounted for Johnson's moderate limitation in concentration, persistence, and pace in his RFC determination. R. 71. Relying on the testimony of a VE, ALJ Kilbane found that Johnson could perform her past work as a production worker and housekeeper, assuming the limitations identified in her RFC. R. 82. ALJ Rippel, also relying on the testimony of a VE, found that Johnson could perform these same jobs. R. 22. Although the hypothetical he presented to the VE did not include a moderate limitation in concentration, persistence, and pace, *see* R. 56–57, based on ALJ Kilbane's prior determination, I cannot find that this omission affected the outcome of Johnson's case. *See Austin v. Astrue*, No. 7:06cv622, 2007 WL 3070601, at *6 (W.D. Va. Oct. 18, 2007) ("Errors are harmless in Social Security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.").

The other deficiencies in ALJ Rippel's assessment of Dr. Merkel's medical opinion were also harmless. Johnson's treatment notes indicate that her symptoms were consistently mild or moderate, as reflected by her GAF scores. These GAF findings correspond to Dr. Merkel's and other medical providers' observations and findings on the mental status examinations, which also were generally mild. These findings are inconsistent with the severe limitations noted in both of Dr. Merkel's opinions. Thus, the ALJ's determination that Dr. Merkel's opinions were inconsistent with contemporaneous treatment notes is supported by the record. Such an inconsistency provides a proper basis for the ALJ to discredit the opinion of a treating physician.

As he did regarding Johnson's physical limitations, ALJ Rippel relied heavily on the findings made by ALJ Kilbane regarding Johnson's mental limitations. R. 21–22. ALJ Kilbane found that the limitations caused by Johnson's mental health conditions were not so severe as to be disabling. R. 81–82. ALJ Rippel properly found that the subsequent medical evidence (aside from Dr. Merkel's opinions) does not show that Johnson's mental condition has worsened. The only exception, as ALJ Rippel noted, was Johnson's new diagnosis of agoraphobia with panic disorder, which he accounted for by imposing additional restrictions on Johnson's social interactions. R. 22.

ALJ Ripple's analysis of Johnson's treating physicians' opinions, while containing some flaws, was adequate. His RFC determination also contained some flaws, but in this case, those flaws were harmless. Considering the record as a whole, ALJ Ripple's determination at step four that Johnson's functional ability allows her to perform her past work is supported by substantial evidence.

## V. Conclusion

This Court must affirm the Commissioner's final decision that Johnson is not disabled if it is consistent with the law and supported by substantial evidence in the record. The Commissioner has met both requirements. Accordingly, the Court will **DENY** Johnson's motion for summary judgment, ECF No. 13, and **GRANT** the Commissioner's motion for summary judgment, ECF No. 17. A separate Order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to the parties.

ENTER: November 4, 2015

Joel C. Hoppe
United States Magistrate Judge